Donn **FORD**, Carlee Gerald, and **Kerry Thomas**

v.

**PENNZOIL, et al.**

**Civil Action No. 94-3948.**

United States District Court, E.D. Louisiana.

July 30, 1997.

---

Marvin Gros, Donaldsonville, LA, for Donn Ford, Charlee Gerald, Kerry Thomas.

Shelley Hammond Provosty, New Orleans, LA, for Spider.

G. Beauregard Gelpi, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, for Carroll McCall, Inc.

## ORDER AND REASONS

MENTZ, District Judge.

Plaintiffs Donn Ford, Carlee Gerald, and Kerry Thomas filed this suit for personal injuries against Spider Staging Corporation (Spider), Pennzoil Company, and Carroll McCall, Inc. (McCall's)[1] as the result of an accident on November 18, 1994 involving Ford's fall in a piece of equipment known as a "spider." Prior to trial all claims of plaintiff Donn Ford and all claims against Pennzoil were settled. The remaining claims of Gerald and Thomas (described below as "plaintiffs") against Spider and McCall's were tried to the court.

At the time of the accident, Ford and the plaintiffs were employed by Meaux Sandblasting, Inc. (MSI) and were working on an offshore platform owned by Pennzoil. Ford was working in the spider which is a basket-like device used by blasters and painters to suspend themselves beneath a structure to reach areas that are otherwise inaccessible.

The spider was owned and manufactured by Spider and rented to MSI. The spider was suspended from beneath some grating of the platform. As Ford attempted to move the location of the spider, he and the spider fell approximately 50–60 feet into the water below.

Ford was wearing a life preserver, but he was rendered unconscious. Thomas heard the fall and was the first to get down to the water level. He did not have on a life vest, but he jumped in the water with a rope and swam to Ford. The rope was too short to reach Ford. The men on the platform threw Thomas a life vest. Then, Gerald jumped in the water with a life ring which had no rope attached. MSI and Pennzoil attempted to launch the platform's rescue capsule, but it malfunctioned. MSI then placed a radio call for boats in the area to come to the rescue.

McCall's is in the business of transporting oilfield personnel by motor vessel to offshore platforms. Its vessel, the CARROLL McCALL, was on its way to the Pennzoil platform when it received the radio call, responded, and rescued the men.

The spider in this case is classified as a single-point adjustable suspension scaffold. A single-point adjustable suspension scaffold is defined in 29 C.F.R. § 1926.452(28) as:

A manually or power-operated unit designed for light duty use, supported by a single wire rope from an overhead support so arranged and operated as to permit the raising or lowering of platform to desired working positions.

A spider is moved by transferring the weight of the spider from the main cable to a transfer chain. When the weight of the spider is on the main cable, the transfer chain is slack. When the transfer chain is slack, its hook can sometimes come loose from movement in the spider. In that event, there is no effect on the spider's suspension because the weight is on the main cable. Due to the weight of the spider (800 to 1,000 pounds), the hook on the main cable cannot be released unless the weight of the spider is transferred to the transfer chain. Once the hook on the transfer chain is engaged, the weight of the spider prevents the hook from coming lose.

The transfer chain hook is an open hook, designed to go around, not through, the chain link. The hook is self-locking in the sense that it cannot disengage unless the load is removed.

The transfer chain on the spider used by Ford had a wire bail tied around one of the links. MSI employees had put the wire there to keep the hook from shaking lose while the weight was on the main cable. The wire is not necessary to properly use the spider.

Spider does not recommend the use of a wire bail. A wire bail is unsafe for two reasons: (1) it gives a false sense of security so one might not check the hook before releasing the main cable; and (2) the wire bail can prevent the hook from properly engaging and slipping lose. In fact, the preponderance of the evidence is that the wire

1. Substituted by stipulation in place of McCall's    Boat Rentals, Inc.

caused the hook to slip lose and the spider to fall. Without the wire, the hook would have worked as intended.

A worker in spider is protected from falling by using what is referred to as "100% hook-up." This means a body harness and two safety lanyards. With two lanyards, a worker is never without a safety connection because only one lanyard is unhooked at a time.

The MSI employees had the equipment available to use double lanyards. The MSI foreman packet stated that a worker should use "lanyards" (plural) connected to a safety belt. Even so, MSI did not enforce or communicate a "100% hook up" policy.

The MSI workers understood that they had to be "hooked up at all times." This was interpreted by MSI employees including the foremen to mean a procedure using only one lanyard but always moving the lanyard *before* attempting to transfer the spider by unhooking the main cable.

Spider provided an operations manual to MSI which MSI operations attached to each spider with a tie wire before it was sent out to the platform. Spider also put a 3 × 4 inch warning sticker on its spiders. The sticker does not describe how to make a transfer, but it does indicate that more than one lanyard or safety line should be used. The sticker states:

CAUTION—To Avoid Risk
of Injury or Death

Safety harnesses, lanyards, grab devices and safety line*s* are to be used by each occupant on this equipment. (Emphasis added.)

The sticker also states in bold letters: "Read and understand the Operator's Manual."

None of the MSI employees who used the spider or their foremen were aware of any MSI or Spider manuals or written instructions addressing spider operations or safety. The warning sticker on this particular spider was covered with paint.

MSI did not train its employees in spider operation before putting them to work in a spider; but it did test their knowledge and experience on using spiders before hiring them. Spider conducted a safety class for MSI employees which addressed the components of a spider, rigging, safety, and operating procedures, including how to use a transfer chain. Ford attended that meeting, as well as MSI safety meetings at which spider safety was discussed.

Ford had five or six years experience working with spiders at the time he was hired by MSI. He was aware of the term "100% hook up" and understood it to mean using double lanyards. In fact, he had used "100% hook up" or double lanyards on other jobs where it was required. Ford could have used double lanyards, but he chose not to while working for MSI.

Ford admitted, and it was agreed by the other MSI employees who testified, that if he had used "100% hook up," meaning two lanyards, he would not have fallen into the water when the spider fell. It also was established at trial that even using only one lanyard, Ford would have been protected from falling if he had moved and reconnected his lanyard *before* he unhooked the main cable.

Unfortunately, Ford used neither a double lanyard nor the proper procedure for moving his lanyard. Ford admitted that he hooked the transfer chain, released the main cable, and then unhooked his safety lanyard. At that point, the transfer chain unraveled and the basket fell with Ford in it.

Ford and the plaintiffs drifted together in the sea until the CARROLL McCALL reached them. The seas were cold, and the waves were approximately three feet high. The current carried them several miles away, a distance estimated to be about a fifteen minute boat ride from the platform. The CARROLL McCALL was three to four miles away from the men when it received the rescue call.

When the CARROLL McCALL reached the men, the plaintiffs had been in the water for approximately one to two hours. The plaintiffs were suffering from hypothermia, muscle strain, and exhaustion. The CARROLL McCALL approached the men from the down current side and disengaged its engines when it was about 40′ away to allow

the men to drift toward the boat. The crew immediately threw in a life ring and lowered a ladder off the side of the vessel for the men to climb out of the water. The current brought the men to the boat in about three minutes. The plaintiffs informed McCall's that Ford was injured. McCall's invited the plaintiffs on board, but they refused because they believed they should stay in the water with Ford until the medical personnel arrived. McCall's would have put other men in the water with Ford had the plaintiffs agreed to come on board.

While waiting for medical personnel, the men drifted close to the side of the CARROLL McCALL. Every time a swell would come, it would push the men into the boat, which was rolling in the waves. For a brief period, the vessel struck the plaintiffs in the back, head, and neck about eight to ten times when it rolled in the waves. The plaintiffs did not ask the captain to reposition the vessel. McCall's was not aware that the boat was striking the men. Even had McCall's been aware, it could not relocate the vessel because engaging the engines could have sucked the men under.

McCall's then lowered a 12–man life raft into the water. It was about twelve minutes from the time the boat arrived on the scene that the life raft was lowered in the water.

A third man who got in the water to assist and was able to pull Ford into the life raft; the plaintiffs remained hanging on the side. While waiting for the medical personnel, the plaintiffs were stung by a jelly fish. The medical personnel arrived after about an hour. A nurse got in the water, quickly checked Ford's vital signs, and directed the crew to pull him out by ropes tied under his arms.

McCall's rescue saved the men from being lost at sea.

The plaintiffs contend that the spider fell because the transfer chain was equipped with an open hook, rather than a style of hook that could close and lock. They contend that their injuries from the rescue attempt are the proximate cause of the fault of both Spider and McCall's.

## Liability of Spider

The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of liability for a manufacturer for damages caused by its product. La.Rev.Stat.Ann. § 9:2800.54(A) imposes strict liability on manufacturers and sets forth the threshold elements which must be proven by a claimant, providing as follows:

A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

The statute places the burden of proof on the plaintiff. § 9:2800.54(D).

The plaintiffs introduced the testimony of J.J. Renfro to establish that the hook on the transfer chain was defectively designed. Renfro testified that the hook should have been a type that has a closing or locking mechanism.

■ The admissibility of an expert opinion depends on satisfaction of Federal Rule of Evidence 702, that is, that the proposed expert is "qualified as an expert by knowledge, skill, experience, training, or education." See *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir.1988); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir.1985). The district court has the obligation to ensure that the witness has the necessary qualifications and that there is sufficient basis for his opinion. See *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1431 (5th Cir.1989).

■ Renfro holds a petroleum engineering degree from the University of Texas. He has worked for Phillips Petroleum Co. and Atlantic Richfield, and as a petroleum engineering consultant. He has experience installing equipment, designing layout, and reviewing operations to improve profitability on oilfield platforms. He has prepared safety manuals for offshore operations of independent producers on platforms. He is a member of the American Petroleum Institute,

which sets standards for petroleum operations.

Renfro is not a mechanical engineer. He has no practical experience with spiders. He has never operated nor been in a spider. His only familiarity with the operation of a spider is from reading the deposition testimony in this case and from sitting in court. While it is true that a witness can qualify as an expert even though he lacks practical experience, he must otherwise have relevant training, education, or knowledge to support his opinion. *See* Fed.R.Civ.P. 702.

Renfro's professional training and accomplishments are impressive. However, there is no evidence that Renfro has any academic experience or training regarding mechanical design, or the design of spiders or any other type of mechanical scaffolding. There is no evidence that he consulted treatises or design manuals bearing on how the spider was designed, manufactured or used. Renfro did not offer any analytical study or research as a basis for his opinion. The only basis for Renfro's opinion outside of the testimony in this case and his examination of the spider is the Code of Federal Regulations on Occupational Safety and Health Standards (OSHA) and the Mineral Management Services (MMS) regulations. Renfro admitted that he has no familiarity with any regulations related to fall protection equipment or guidelines for suspended power scaffolding.

The court qualified Renfro as an expert in petroleum engineering as it relates to safety on offshore platforms. This ruling did not qualify Renfro to testify about the design of the spider. Nevertheless, in light of the fact that this was a non-jury trial, the court permitted Renfro to testify about the design of the spider, over Spider's objections, ruling that Renfro's lack of qualifications would bear on the weight the court would give to his testimony.

Having heard Renfro's testimony in full and in light of the evidence against his qualifications on the matter at issue, the court finds that Renfro does not possess the experience or qualifications necessary to render a reliable opinion in the area of spider design. The court is unable to accept his testimony that the design of the hook should have been closed. As a result, the plaintiffs have failed to satisfy their burden to prove by a preponderance of the evidence that the design of the Spider was unreasonably dangerous.

■ Even if the court considers the substance of Renfro's testimony regarding the spider design, the court finds that his testimony fails to establish that the spider design was unreasonably dangerous. Renfro testified that the open hook was a defective design because it allowed the hook to come lose. He relied on MMS and OSHA regulations which either are not applicable to spiders, or contain no requirement for a closed hook.

The MMS regulations apply to operations conducted by a mineral lessee on the Outer Continental Shelf. *See* 30 C.F.R. § 250.5(a); 30 C.F.R. § 250.2 (defining "lessee"). Under those regulations, a standard of safe and workmanlike operations is imposed on the mineral lessee. *See* § 250.20(a). Therefore, the MMS regulations do not apply to Spider. In addition, the MMS section cited by Renfro addressing crane operations is not applicable because the spider is not a crane. *See* § 250.20(c).

Renfro also relied upon OSHA, 29 C.F.R. § 1926.550(g)(4)(iv), which requires closed and locked hooks on personnel platforms suspended by a crane or derrick. Section 1926.550(g)(4)(iv) is not applicable because this spider was not suspended by a crane or derrick.

The OSHA standards located in Part 1910, Subpart D addressing walking and working surfaces are applicable. *See* 29 C.F.R. § 1910.28(v) (The scope of this section "establishes requirements for the construction, operation, maintenance, and use of scaffolds used in the maintenance of buildings and structures").

Section 1910.28(i) contains specific requirements for single-point adjustable suspension scaffolds. Contrary to plaintiffs' assertion, there is no requirement in § 1910.28, for closed or locked hooks.

Also applicable is Part 1926, Subpart L, covering scaffolds. The requirements for scaffolding do not include any provision for

closed or locked hooks. *See* §§ 1926.451 and 1926.452.

Accordingly, the court finds that a closed or locked hook design was not required by statute. The court further finds that the plaintiffs failed to establish by a preponderance of the evidence that the spider design was unreasonably dangerous.

Based on Renfro's lack of qualifications to render an opinion in this case together with the unfounded basis for his opinion, the court rejects Renfro's testimony in favor of the testimony of Spider's expert, Ole Leivestad. Leivestad worked for Spider as Chief Engineer and Director of Engineering. He has expertise in manufacturing, use, and design of a spider. The court qualified him as an expert in mechanical engineering with particular expertise in the design and operation of the type of spider at issue in this case.

Based on Leivestad's testimony, the court finds that the tie wire MSI employees placed around the transfer chain was the immediate and direct cause for the spider to fall, rather than any aspect of the spider design.

### *Liability of McCall's*

■ To establish liability in a negligence case, the plaintiff must show that: (1) the defendant had a duty to conform its conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause of the plaintiff's injuries; and (4) the risk of harm was within the scope of the breached duty. *Fox v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, 576 So.2d 978, 981 (La.1991).

■ A vessel that undertakes a rescue has a duty to act reasonably under the circumstances. *See Champagne v. McDonald*, 355 So.2d 1335 (La.App.3d Cir.1978). Once a vessel gets close to men in the water, the crew must be prepared to pull the men out immediately.

■ The court finds that McCall's conduct conformed to its obligations as a rescuer. McCall's appropriately disengaged its engine and allowed the current to bring the men to the boat rather than to bring the boat to the men. McCall's immediately attempted to bring the men aboard the vessel. McCall's was under no obligation to forcibly bring the plaintiffs on board. Nothing prevented the plaintiffs from coming on board when the vessel first approached. Once the vessel had cut its engines, it could not start them again without a serious risk of sucking the men into the engines. McCall's acted reasonably under the circumstances by not engaging its engines, in standing by, in putting a 12–man raft into the water, and putting a third man into the water to assist. Accordingly, the court finds that McCall's is not liable in negligence for the plaintiffs' injuries.

The court further finds no evidence to support a claim of unseaworthiness against McCall's.

### *Causation*

The LPLA requires that the unreasonably dangerous characteristic of a defendant's product be a proximate cause of a plaintiff's injury. Having found that the spider was not defectively designed, it is not necessary to discuss causation. The court does so only to set forth its alternative finding that even if the spider's design was unreasonably dangerous, it was not the proximate cause of the plaintiffs' injuries.

Louisiana courts generally define "proximate cause" as any cause which in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred. *See e.g., Sutton v. Duplessis*, 584 So.2d 362, 365 (La. App. 4th Cir.1991).

■ Undoubtedly, if a design defect caused the spider to fall, it would be a cause-in-fact of the plaintiffs' injuries in the sense that the injuries would not have occurred but for the failure of the spider. Proximate cause requires more than a cause-in-fact or "but for" connection. Under a proximate cause analysis, there must be a substantial connection between the actions of a defendant and the harm which occurs. *Id.* (citing *Sinitiere v. Lavergne*, 391 So.2d 821 (La. 1980)).

The strength of the causal connection depends on whether Spider's duty to provide safe equipment encompasses the risk resulting in the plaintiffs' harm. *See Mitchell v. Fidelity & Casualty Co.*, 488 So.2d 1089, 1091 (La.App. 2d Cir.1986) (citing *Carter v. City Parish Government*, 423 So.2d 1080 (La. 1982) and *Hill v. Lundin & Assoc., Inc.*, 260 La. 542, 256 So.2d 620 (1972)).

■ The superseding cause doctrine is a related facet of proximate causation. Under that doctrine, a tortfeasor is not liable for damages brought about by a later, separate, independent, intervening cause, even though the tortfeasor's conduct may have created the original peril. *See e.g., Frederick v. Mobil Oil Corp.*, 765 F.2d 442, 447–48 (5th Cir. 1985); *Thomas v. Hartford Ins. Co.*, 540 So.2d 1068, 1075 (La.App. 1st Cir.), *writ denied*, 542 So.2d 516 (La.1989). The theory is that at some point in the causal chain, a defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal or proximate causation.

■ The spider did not injure the plaintiffs. The plaintiffs were injured during the McCall's rescue which operated independently of any other party's conduct. The harm suffered by the plaintiffs' is different from the harm that would ordinarily result from a defective spider. The open-sea rescue and the injuries suffered by the plaintiffs' were not foreseeable because a worker who properly uses his lanyards remains suspended even if his spider falls into the water. The court finds that duty to design reasonably safe equipment does not encompass the risk that a rescuer will float out to sea and subsequently suffer injury when a third party attempts to rescue the rescuer.

Here, Ford's fall created a condition which attracted the plaintiffs to the scene. Assuming that the spider was defective, it furnished a condition that made the plaintiffs' subsequent injury possible. Some time later, the plaintiffs were injured in another location by a third party whose conduct was unaffected by the original event.[2] Before the plaintiffs were injured, several other factors operated to cause the plaintiffs to find themselves drifting at sea. The evidence established that Ford would not have fallen in the water had he properly used the fall protection equipment. MSI contributed to the accident by not enforcing its policies and allowing its employees to put a wire bail around the transfer chain. The plaintiffs would not have had to jump in the water nor would they have drifted out to sea had Pennzoil provided adequate rescue equipment. All of these factors made the plaintiffs' rescue attempt necessary.[3]

Assuming that the spider was defectively designed, the court finds that the injuries to the plaintiffs were not proximately caused thereby. The plaintiffs' injuries were the result of an independent, intervening cause which superseded and destroyed the causal connection between the spider's failure and the plaintiffs' injuries.

Accordingly,

IT IS ORDERED that all claims of plaintiffs, Carlee Gerald and Kerry Thomas, against defendants, Spider Staging Corporation and Carroll McCall, Inc., are dismissed.

2. That McCall's caused the plaintiffs' harm does not mean that McCall's was negligent. The court has already determined that McCall's is not liable for the injuries caused during the rescue operations it conducted.

3. Having found no liability on the part of either Spider or McCall's, it is not necessary to attribute fault to the non-parties and settling parties.

Had the court found either defendant liable, the fault of Ford, MSI, and Pennzoil would have to be apportioned in accordance with Louisiana principles of comparative fault. *See* La.Civ.Code art. 2323 and 2324; *Keith v. United States Fidelity & Guaranty Co.*, 694 So.2d 180 (La.1997); *Acosta v. Criterion Catalysts Co.*, 949 F.Supp. 454 (E.D.La.1996).